IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

ARLIE S. KISNER,

        Plaintiff,

v.                                 Civil Action No. 5:06CV60
                                 (The Honorable Frederick P. Stamp, Jr.)

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("the Defendant," and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Arlie S. Kisner ("Plaintiff") filed an application for DIB on August 8, 2003, alleging disability since July 18, 2003, due to chronic obstructive pulmonary disease, asthma, insomnia, and

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. §405(g).

degenerative disc disease (R. 108-10, 125).[2] Plaintiff's applications were denied at the initial and reconsideration levels (R. 87-91, 94-96). Plaintiff requested a hearing, which Administrative Law Judge Steven Slahta ("ALJ"), held on March 8, 2005 (R. 29-68). Plaintiff, represented by Regina Carpenter, his lawyer, testified on his own behalf (R.32-64). Also testifying was Vocational Expert James Ganoe ("VE") (R. 64-67). On May 12, 2005, the ALJ entered a decision finding Plaintiff was not disabled in that he retained the residual functional capacity to perform a significant range of sedentary work (R. 14-25). On March 15, 2006, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 4-6)

## II. FACTS

Plaintiff was born on June 21, 1962, and was forty-two years old at the time of the administrative hearing (R. 32, 108). He has a high-school education and past relevant work as a dry-wall installer and finisher and general laborer (R. 116, 126, 130).

On April 7, 2000, Plaintiff had a x-ray made of his lumbosacral spine. The impression was for spondylolysis and Grade I spondylolisthesis of L5-S1 (R. 296).

On May 4, 2002, Plaintiff had a MRI made of his lumbar spine. It showed a slight degree of two millimeter anterolisthesis of L5 on S1; bilateral neural foraminal narrowing at L5-S1; mild

---

[2]On July 15, 2002, Plaintiff filed applications for DIB and SSI (R. 336). These applications were denied initially and upon reconsideration (R. 350-51, 352-59). Plaintiff requested a hearing and, on June 23, 2003, ALJ Barbara Gibbs held an administrative hearing (R. 360, 513-56). On July 17, 2003, the ALJ issued a decision in that case, finding Plaintiff was not disabled in that he could perform a significant range of sedentary work (R. 336-44). Plaintiff's request for review of the ALJ's decision by the Appeals Council was denied on January 8, 2004 (R. 323-27). Plaintiff did not appeal the decision by the Appeals Council, thereby making the ALJ's decision binding. 20 C.F.R. §§ 404.955(b), 416.1455(b). Under the doctrine of *res judicata*, Plaintiff cannot be found disabled for the period prior to July 17, 2003. 20 C.F.R. §§ 404.957, 416.147(c)(1) (2006).

nonfocal disc bulging; and no spinal stenosis (R. 246, 463). Slight disc desiccation at L4-5 and L5-S1 was noted, but no significant loss of disc height was observed. No paraspinal masses were seen (R. 247, 464).

On May 28, 2002, Plaintiff presented to Richard A. Douglas, M.D., upon referral by James E. Malone, D.O., for evaluation. Dr. Douglas noted he had evaluated Plaintiff in April, 2000. Plaintiff informed Dr. Douglas he continued to work at his construction job and had received two epidural steroid injections in Oakland, Maryland, which "gave him good relief for a short period of time." Dr. Douglas reviewed Plaintiff's April 7, 2000, lumbar spine x-ray and May 4, 2002, lumbar spine MRI. He ordered a current MRI and x-ray (R. 424).

On June 8, 2002, Plaintiff had a x-ray made of his lumbar spine, which was negative, except for bilateral pars defects at L5 (R. 251, 425).

Also on June 8, 2002, Plaintiff had a MRI made of his cervical spine. It showed "tiny central posterior disc protrusion at C5-6 and C6-7 with no neurologic impingement" (R. 250, 426).

On July 8, 2002, Dr. Douglas reviewed Plaintiff's June 8, 2002, cervical spine MRI and lumbar spine x-ray. Dr. Douglas discussed pain management and surgery with Plaintiff; Plaintiff chose conservative pain management (R. 423).

On July 18, 2002, Plaintiff informed Dr. Malone that his back hurt "worse" with "the least little bit of activity, including lifting just minimal weight." Plaintiff complained of bilateral leg pain, occasional numbness, and tingling. Plaintiff stated the medications had "given him some relief at times." Dr. Malone observed Plaintiff's mid and distal lumbar and lumbosacral areas were tender to palpation and he had decreased flexion and extension due to pain. Plaintiff's left straight leg raising test was positive. Dr. Malone diagnosed chronic back pain that was stable. Dr. Malone

3

released Plaintiff from work for three months and he opined he felt Plaintiff was and would continue to be permanently disabled (R. 236).

Also on July 18, 2002, Dr. Malone completed an Agency Reporting Form Physical of Plaintiff for West Virginia Disability Determination Section. Plaintiff's blood pressure was 138/92 and his weight was 242 (R. 428). Dr. Malone found the following "signs/symptoms/findings" as to Plaintiff's conditions were normal: joints, muscle bulk, reflexes, sensory deficits, mental status, cyanosis, orthopnea, edema, heart, chest, and circulation (R. 429). Dr. Malone opined Plaintiff had chronic lower spine pain, spondylolisthesis of his lower spine, degenerative disk disease of the lower spine, and asthma (R. 430).

On August 20, 2002, Plaintiff reported his back pain was "no worse, no better." Plaintiff stated he took up to three Percocet daily, depending on his pain. Plaintiff stated he planned to be treated with a steroid epidural injection for his back pain as it had "helped his pain in the past." Dr. Malone observed Plaintiff was not in distress, had no gross neurological deficits or changes, and had good lower extremity strength bilaterally. Dr. Malone noted Plaintiff had distal lumbar and lumbosacral tenderness to palpation and limited flexion and extension due to pain. He diagnosed chronic lumbosacral back pain and refilled Plaintiff's prescription for Lorcet and Percocet (R. 234).

On September 3, 2002, Kip Beard, M.D., performed a ventilatory function examination of Plaintiff and diagnosed mild COPD (R. 431).

Also on September 3, 2002, frontal and lateral x-rays were made of Plaintiff's chest. The results were for "no acute cardiopulmonary process" (R. 432).

On September 16, 2002, Dr. Malone noted he refilled Plaintiff's Percocet and did not provide an additional refill as Plaintiff had, on a "few incidences, . . . used more than two a day" (R. 233).

4

On September 23, 2002, Hugh Brown, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment and reduced Plaintiff's RFC to light work (R. 434-41).

On October 1, 2002, Plaintiff presented to Dr. Malone with chronic lumbosacral back pain and hypothyroidism. Dr. Malone noted Plaintiff was "feeling a bit more energetic on the Synthroid." and his back was "still the same." Plaintiff stated he could not "do anything for more than five or ten minutes at a time without causing increasing back pain, going down both legs at times." Dr. Malone opined Plaintiff was in no distress, had no neurological changes, had positive distal lumbar and lumbosacral tenderness, but, otherwise, an unchanged musculoskeletal exam from previous exams. Dr. Malone diagnosed hypothyroidism and chronic lumbosacral back pain. He opined Plaintiff was permanently and totally disabled (R. 231).

On November 7, 2002, Plaintiff reported to Dr. Malone that he experienced tightness in his back in the mornings and occasionally throughout the day. He stated "any activity at all seem[ed] to set his back off and ma[de] it feel worse with radiation of the pain down both legs but the left . . . worse than the right." Dr. Malone opined Plaintiff was in no distress, his straight leg raising test was positive on the left, there was a slight weakness in the left lower extremity, there was no foot drop, and there was "some ankle weakness in the left lower extremity." Dr. Malone diagnosed chronic lumbosacral back pain. Dr. Malone noted he "[felt] [Plaintiff] ha[d] a considerable degree of muscle spasm." He prescribed Zanaflex (R. 229).

On January 7, 2003, Plaintiff presented to Dr. Malone for follow-up for his chronic lumbosacral back pain. Plaintiff stated his pain was "a little bit worse" and "whenever he [did] the least little thing his back seem[ed] to worsen with pain and numbness and pain [went] down the left leg . . . ." Plaintiff's left straight leg test was positive, but no other gross motor or sensory deficits

were observed. Dr. Malone diagnosed chronic lumbosacral back pain with radiculopathy, prescribed Percocet, and instructed Plaintiff to continue with a walking program (R. 227, 486).

On January 14, 2003, Fulvio R. Franyutti, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff and found Plaintiff had a RFC to perform light work (R. 472-77).

On February, 18, 2003, Plaintiff presented to Dr. Malone with complaints of worsening back pain, constant spasm, and pain and weakness in left leg. Dr. Malone observed a "slight" weakness in Plaintiff's left leg. He diagnosed chronic lumbosacral back pain with radiculopathy, recommended treatment at the pain clinic, and prescribed Percocet (R. 484-85, 226). Dr. Malone opined Plaintiff was permanently disabled (R. 484).

On February 25, 2003, Dr. Malone completed a Back Questionnaire of Plaintiff. He noted Plaintiff's diagnosis was for spondylolysis, neural foramina, and cervical disc disease (R. 495). Dr. Malone opined Plaintiff's motion was limited by any activity; he experienced intermittent motor loss in his lower extremities; he experienced muscle weakness in his legs, but he had no reflex or sensory loss (R. 496).

On March 21, 2003, Plaintiff presented to Dr. Malone for follow-up treatment to his chronic back pain and hypothyroidism. Plaintiff reported he had received an epidural injection for his pain and it had "helped somewhat," but that he was "still" in a "considerable amount of pain." Plaintiff reported feeling well "otherwise." Dr. Malone's assessment was for chronic lumbosacral back pain. He recommended Plaintiff receive a second epidural injection and prescribed Percocet (R. 223, 482).

On June 26, 2003, Plaintiff reported to Dr. Malone that his back and neck muscles were "more tight," but he had not experienced worsening of "numbness, paralysis, tingling in the

6

extremities." Dr. Malone observed Plaintiff was in no distress, had no gross neurological deficits, had symmetrical back, had tenderness to the right mid and lower distal lumbar regions, had decreased flexion and extension, had good range of motion in his extremities, had good pulses, and had no edema. Dr. Malone diagnosed chronic low back pain with muscle spasm. He prescribed Zanaflex and instructed Plaintiff to take this medication at night. Dr. Malone instructed Plaintiff to "use[] his Percocets sparingly . . ." (R. 221).

On August 29, 2003, Plaintiff informed Dr. Malone that his back pain was worsening and intensifying. He stated he was "unable to do just about anything" and he was "getting depressed, tired, run down, [and] just [didn't] feel like doing very much of anything because of the pain." Dr. Malone noted Plaintiff's affect was flat, his mood was "down," his train of thought was logical, his speech was free flowing and logical, he had no paranoid delusions, he had no hallucinations, he had no homicidal or suicidal ideations, he had a "slight" weakness in his left lower extremity, his back was symmetrical, he had positive moderate lumbar and distal lumbosacral tenderness to palpation, his flexion was limited to approximately twenty degrees, his straight leg raising test was positive bilaterally, his chest was clear, and his heart was regular. Dr. Malone diagnosed chronic low back pain with foraminal narrowing and depression. Dr. Malone referred him to Dr. Douglas for further evaluation and continued him on his current medications (R. 219).

On September 30, 2003, Dr. Douglas evaluated Plaintiff. He noted Plaintiff was treated for spondylolisthesis, secondary to spondylolysis, with three epidural steroid injections and Oxycodone. Dr. Douglas reviewed Plaintiff's May 4, 2002, MRI of his lumbar spine and the April 7, 2000, x-ray of the lumbar spine. He found Plaintiff had "significant pathology with a history of a grade 1 spondylolisthesis of L5 on S1 with bilateral neural foraminal narrowing at L5 on S1 with bilateral

spondylolysis of L5." Dr. Douglas reiterated his recommendation that Plaintiff undergo surgery; however, Plaintiff requested that he be treated with conservative management. Dr. Douglas informed Plaintiff that "after exhausting all options, it will be imperative that his last option would be surgical treatment." Dr. Douglas referred Plaintiff to Dr. Labatia, a physiatrist, and ordered a repeat MRI of his lumbar spine (R. 249).

On October 2, 2003, Plaintiff had a lumbar spine x-ray made with flexion/extension lateral views. The impression was for "[v]ery minimal wedging of L1 unchanged consistent with a very minor chronic compression fracture" and "L5 spondylolysis with high grade I versus early grade II spondylolisthesis, not changing with flexion or extension or from previous examination (R. 295).

On October 8, 2003, Ihab Y. Labatia, M.D., completed an outpatient/initial evaluation of Plaintiff. Plaintiff's chief complaint was low back pain radiating down both lower extremities. Plaintiff reported he had received chiropractic treatment until six months earlier; had not undergone physical therapy for his condition; had treated his pain for the past two years with three or four Oxycodone pills daily; took Salsalate for arthritis and Zanaflex for spasms, which caused "sleeping"; and took sleeping pills for sleep, but they did not help. Plaintiff described his low back pain as "dull aching to throbbing pain which radiate[d] down both lower extremities, left worse than right." Plaintiff stated his pain was a "seven" on a scale of one to ten. Plaintiff stated he could sit, stand and walk for fifteen minutes, but that prolonged sitting and standing exacerbated his pain. Plaintiff reported he had received three epidural steroid injections for his back pain. The two that were administered in 1989 "helped" for about one month and the injection he received one month earlier to his examination by Dr. Labatia did not help (R. 318).

Dr. Labatia noted Plaintiff smoked three packages of cigarettes daily, drank occasionally, last

worked in July 2002, was not receiving disability, and had no source of income. Upon examination, Dr. Labatia noted Plaintiff was not in acute distress or pain. Dr. Labatia found Plaintiff had no swelling, redness, and normal lordosis of his lumbosacral spine region. Plaintiff had tenderness on deep palpation over the left paraspinal area and "some" tenderness in his left SI joint area. Plaintiff's range of motion was 70-80 degrees flexion and 30 degrees extension and lateral bending. Plaintiff's straight leg raise test, Patrick's test, and Gaenslen's test were negative. Plaintiff's neurological examination revealed no motor deficits in his lower extremities. His knee and ankle jerks were "2+ bilateral." Plaintiff had intact pinprick sensation in his right lower extremity and diffusely impaired pinprick sensation in his left lower extremity. Dr. Labatia reviewed Plaintiff's June 8, 2002, MRI of his cervical spine and opined it showed a "tiny central posterior disc protrusion a C5-6 without associated spinal stenosis" or nerve root impingement. Dr. Labatia noted there was a "similar process at C6-7 with no neurologic impingement" and that the MRI was "unremarkable . . . [o]therwise." Dr. Labatia also reviewed Plaintiff's May 4, 2002, lumbar MRI and opined it showed a "slight degree of 2-millimeter anterolisthesis of L5-S1" and no spinal stenosis. Dr. Labatia found there as "bilateral neural foraminal narrowing at L5-S1 with a mild non-focal disc bulge at L4-5" and a "slight disc desiccation at L4-5 and L5-S1 with no significant loss of disc height" (R. 319). Dr. Labatia opined Plaintiff's pain appeared to be "mechanical in nature secondary to lower lumbar facet joint arthropathy" and appeared to have a "discogenic element." Dr. Labatia found Plaintiff did not have any radiculopathy in his lower extremities, such as "weakness, dermatomal sensory loss, [or] . . . bladder or bowel problems" (R. 319). Dr. Labatia recommended Plaintiff have L3-4, L4-5, and L5-S1 facet steroid injections. He further recommended Plaintiff receive a lumbar or caudal epidural steroid injection for discogenic pain. Plaintiff stated he would consider the treatment. Dr.

9

Labatia recommended Plaintiff continue with his current pain medications and receive physical therapy for spinal stabilization techniques and stretching and strengthening exercises to his lumbar extensors. Plaintiff agreed to this course of treatment but stated he would "like to hold off for now" due to the cost of physical therapy (R. 320).

On October 10, 2003, Plaintiff reported to Dr. Malone that his back pain was "no worse and no better." Dr. Malone noted Plaintiff's back was symmetrical with moderate tenderness in the lower lumbosacral spine. Plaintiff's range of motion of his lower extremities was decreased due to pain. Plaintiff complained of rectal bleeding. Dr. Malone diagnosed chronic lumbosacral back pain, abdominal pain, and rectal bleeding. Dr. Malone prescribed Prevacid, discontinued the prescription for Disalcid, and scheduled a colonoscopy and upper endoscopy with Dr. Roidad (R. 217).

On November 12, 2003, Plaintiff presented to Dr. Malone for follow-up to his rectal bleeding. Plaintiff stated he was not going to be examined by Dr. Roidad due to cost. Plaintiff stated his back pain prevented him from "do[ing] anything." Plaintiff stated he was depressed at times, but Lexapro had "helped to a degree . . . ." Dr. Malone noted Plaintiff was in no distress, but was uncomfortable. Plaintiff's affect was flat, but he had no suicidal or homicidal ideations, no paranoid delusions, and no visual or auditory hallucinations. Plaintiff's train of thought was logical, his insight was good, his chest was clear, his heart was regular, and the remainder of the exam was unchanged from previous examinations. Dr. Malone diagnosed rectal bleeding and chronic lumbosacral back pain with depression. He prescribed Lexapro and Zanaflex (R. 215).

Also on November 12, 2003, Dr. Malone wrote a letter, addressed "To Whom It May Concern." He opined Plaintiff suffered from "chronic lumbosacral back pain secondary to Grade I spondylolisthesis of L-5 on S1 with bilateral neural foraminal narrowing and bilateral spondylolysis

10

of L-5." Dr. Malone wrote Plaintiff's condition had 'significantly deteriorated" over the past several years and his "daily pain . . . seem[ed] to be increased significantly with any increase in activity or just from sitting for any significant amount of time (greater than thirty to forty-five minutes)." Dr. Malone wrote Plaintiff was depressed "due to his inability to work or engage in any meaningful employment or activity," he had prescribed Lexapro for depression treatment, and Plaintiff had realized "some improvement" from his depression symptoms from the medication. Dr. Malone opined Plaintiff was "permanently and totally disabled" and that this opinion had "also been acknowledge by a neurosurgeon" (R. 214).

On December 1, 2003, Plaintiff had a x-ray made of his lumbar spine. It was normal. Also on that date, a x-ray was made of his right knee, which showed "an avulsion of the tuberosity of the tibia," but otherwise normal (R. 200).

On December 3, 2003, B. J. Kerbyson, D.O., completed an Internal Medical Examination of Plaintiff. Plaintiff's chief complaint was he was "claiming disability due to" his "'lower back.'" Plaintiff reported he had chronic low back pain for twenty years after a motor vehicle accident in 1980 where he fractured his L5 vertebra. Dr. Kerbyson noted Plaintiff had had a MRI in 2002, which showed spondylolisthesis, spinal stenosis, and degenerative joint disease, but had not had a Myelogram, a EMG, or surgery for treatment of his lower back condition. Plaintiff reported he had received three steroid epidural injections from 1988 to 2002, from which he realized "some relief." Plaintiff described his pain to Dr. Kerbyson as "some burning and stabbing pain in the lumbar area that radiates into both legs, but primarily the left leg" and "numbness and tingling in both legs, but primarily in the left leg," and "weakness in . . . the left leg." Plaintiff reported his back pain was aggravated by "bending, stooping, sitting, lifting, standing, coughing, and riding in a car." Plaintiff

11

stated he used a back brace, heat, cold, and a chiropractor as treatment for his back condition, but not physical therapy (R. 193).

Plaintiff reported medicating with Lexapro, Advair, Prevacid, Amitriptyline, Percocet, Synthroid, and Zanaflex. Plaintiff reported his past medical history was for asthma, hypothyroidism, depression, and chronic low back pain. Plaintiff reported smoking two packages of cigarettes per day for the past twenty years and drinking alcoholic beverages occasionally. Plaintiff stated he experienced shortness of breath due to cigarette smoking. Plaintiff's weight was registered at 253 pounds and his blood pressure was 126/78 (R. 194).

Dr. Kerbyson noted Plaintiff had a normal gait, was comfortable in the sitting position, but uncomfortable in the supine position (R. 194-95). Dr. Kerbyson found Plaintiff's recent and remote memories were good for medical events. He noted Plaintiff ambulated with a limp, but was not unsteady, lurching, or unpredictable. Dr. Kerbyson found Plaintiff's HEENT, neck, cardiovascular, abdomen, upper extremity, neurological, and hand examinations were normal (R. 195-96). He opined Plaintiff's chest examination was normal except his breath sounds were slightly diminished, he experienced shortness of breath with exertion, and clubbing was present (R. 195).

Dr. Kerbyson found Plaintiff had no tenderness in his legs; no redness, warmth, swelling, fluid, laxity, or crepitus in his knees, ankles or feet; and no tenderness, redness, warmth, swelling, or Homans signs in his calves (R. 195). Plaintiff's cervical spine examination was normal. Plaintiff's dorsolumbar spine examination was normal. His straight leg raising test was normal in the sitting position. Straight leg raising test was positive at 30 degrees bilateral in the supine as Plaintiff complained of pain. Plaintiff could stand on one leg. Plaintiff had no joint tenderness, redness, warmth, swelling, or crepitus. Plaintiff complained of pain with range of motion testing,

12

but Plaintiff's lumbosacral spine range of motion was normal. Plaintiff was able to walk on his heels and toes, perform tandem gait, and squat without difficulty. Dr. Kerbyson found Plaintiff's cranial nerves were intact; his muscle strength and tone were normal in upper and lower extremities; he had no atrophy; his sensory modalities were well preserved; his reflexes were symmetrical and graded normally bilaterally; his Hoffman and Babinski's signs were negative; he had no clonus, and his motor modalities were well preserved (R. 196).

Dr. Kerbyson's impression was for moderate obesity; chronic low back pain; history of asthma, hypothyrodism, and depression; and possible COPD (R. 196). Dr. Kerbyson opined Plaintiff's ability to perform work-related activities was "mildly impaired" (R. 196-97).

On December 10, 2003, Thomas Lauderman, D.O., a state agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 202). Dr. Lauderman found Plaintiff was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl (R. 203). Dr. Lauderman found Plaintiff had no manipulative, visual, or communicative limitations (R. 204-05) and was unlimited in his exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation. He opined Plaintiff should avoid concentrated exposure to extreme cold and heat and hazards (R. 205). Dr. Lauderman reduced Plaintiff's RFC to light (R. 206).

On January 7, 2004, Plaintiff reported his rectal bleeding had ceased. He refused to be examined by a gastroenterologist or to undergo a colonoscopy. Plaintiff reported his asthma had improved and he used Advair "only sparingly." Plaintiff stated he was still smoking. Plaintiff stated

13

his back was "about the same" (R. 212).

On February 6, 2004, Plaintiff reported to Dr. Malone that he was experiencing worsening lower back pain. He stated he was "trying to see Dr. Douglas for further evaluation as his disability specialist told him that . . . is the only thing that will help him get his disability is for his neurosurgeon to say that he is disabled." He stated that he was at his "wits [sic] end with that and that his whole pension and disability depends on the neurosurgeon." Dr. Malone suggested a referral to the pain clinic to Plaintiff; he reluctantly agreed. Dr. Malone would not prescribe OxyContin, but he did increase Plaintiff's Percocet to one tablet, four times daily (R. 210).

On February 23, 2004, Plaintiff returned to Dr. Douglas for evaluation. Dr. Douglas noted Plaintiff had a history of spondylolisthesis, secondary to spondylolysis, continued to experience "increase[d] . . . pain," and treated his pain with Oxycodone. Dr. Douglas also noted Plaintiff had been examined by Dr. Labatia on October 8, 2003, who recommended left L3-4, L4-5, and L5-S1 facet injections, which Plaintiff had not yet received. Dr. Douglas reviewed Plaintiff's May 4, 2002, MRI of his lumbar spine and the April 7, 2000, x-ray of his lumbar spine. Dr. Douglas recommended Plaintiff treat his condition with "conservative management with facet injections as per Dr. Labatia's" recommendation. Dr. Douglas further opined Plaintiff had been treating his condition with narcotics for a "long period of time and ha[d] been off work for two years"; therefore, it would be "unlikely that he [would] ever return to gainful employment" and he supported Plaintiff in his "pursuing his disability since [he] doubt[ed] any surgical intervention would return him to gainful employment" (R. 248).

On March 10, 2004, James Capage, Ph.D., a state-agency psychologist, completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had an affective disorder that was not

14

severe (R. 253). Dr. Capage opined Plaintiff's affective disorder was depression (R. 256). Dr. Capage found Plaintiff's degree of functional limitations caused by depression were as follows: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace. Dr. Capage found Plaintiff had not experienced episodes of decompensation (R. 263). Dr. Capage opined Plaintiff did not meet the "C" criteria in Listing 12.04 (R. 264).

On March 12, 2004, Dr. Franyutti, a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 269). Dr. Franyutti found Plaintiff was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl (R. 270). Dr. Franyutti found Plaintiff had no manipulative, visual, or communicative limitations (R. 271-72) and was unlimited in his exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation. He opined Plaintiff should avoid concentrated exposure to extreme cold and heat and hazards (R. 272). Dr. Franyutti noted his disagreement with Dr. Malone's November 12, 2003, opinion that Plaintiff was "permanently and totally disabled" and found he could perform light work (R. 269, 274).

On March 24, 2004, Dr. Labatia gave Plaintiff nerve root blocks at L5 and S1 (R. 277).

On March 30, 2004, Plaintiff presented to Dr. Labatia for a follow-up examination for his nerve root blocks. Plaintiff reported he realized "temporary relief in his pain symptoms for a couple of days following the injection," but the pain had returned to the "preinjection level." Plaintiff stated the pain was dull, aching, throbbing, and sharp lower back pain. He rated his pain as "7 to 10/10."

Plaintiff stated coughing, sneezing, bending, lifting, twisting, and "prolonged sitting or standing or walking beyond 10-15 minutes" aggravated his pain, and he experienced numbness, tingling, and weakness in both lower extremities. Plaintiff treated his pain by taking four Percocet daily. Plaintiff also informed Dr. Labatia that he experienced bilateral knee pain and swelling (R. 278).

Dr. Labatia's examination of Plaintiff revealed swelling over the left lumbar paraspinal area and flattening of lumbar lordosis. Dr. Labatia observed muscle spasms on palpation over the left paraspinal area. Dr. Labatia noted Plaintiff had tenderness over the left lumbar paraspinal area, over the spinous processes, and over the right lumbar paraspinal area. He found Plaintiff's ROM was limited to thirty degrees of flexion and ten degrees of extension. Plaintiff's supine straight leg raising test was positive bilaterally. Gaenslen's and Patrick's test were positive for left sacroiliac joint pain. Plaintiff's muscle strength in both lower extremities was "4 to 4+/5." Pinprick test showed diminished sensations over bilateral S1, L-2, and L-3 dermatomes. Deep tendon reflexes showed 2+ bilateral ankle and knee jerks. Plaintiff's gait was bilaterally antalgic when heel to toe walking (R. 278). Dr. Labatia's examination of Plaintiff's knees revealed some swelling in his right knee, but no redness or warmth. There was tenderness along the joint lines and mild right knee effusion. Range of motion was full, Lachman's test was negative bilaterally, and McMurray's test was negative bilaterally (R. 279).

Dr. Labatia assessed Plaintiff with low back pain radiating down both lower extremities, which was "most likely caused by bilateral L5-S1 radiculopathy . . . ." "[A] large component of mechanical lower back pain caused by lumbar facet arthropathy and left sacroiliac joint arthropathy." Dr. Labatia noted Plaintiff had failed pain medication, three epidural injections, and nerve root blocks as treatment (R. 279). Dr. Labatia opined Plaintiff had reached maximum medical

16

improvement relative to his back condition. He found Plaintiff would be unable to "tolerate any reasonable amount of sitting, standing or walking which [would] be needed in most job environment [sic] and hence I strongly recommend patient be placed on disability." Dr. Labatia recommended Plaintiff continue treating his back pain with Percocet. He injected Plaintiff's right knee with cortisone. He advised Plaintiff to continue his home exercise program (R. 279).

On March 30, 2004, Dr. Labatia completed a Back Questionnaire of Plaintiff. He diagnosed Plaintiff with lumbosacral spinal stenosis and lumbar facet arthropathy. He based his diagnosis on the May 4, 2002, MRI of Plaintiff's lumbar spine, which he found showed bilateral neural foraminal narrowing at L5/S1 and anterolisthesis of L5 on S1, and the June 8, 2002, lumbosacral x-ray of Plaintiff, which showed bilateral pars defects at L5 (R. 280). Dr. Labatia opined Plaintiff experienced intermittent muscle spasm mostly over left lumbar paraspinal area. Dr. Labatia found Plaintiff's limitation of motion was continuous in that his flexion was thirty degrees and his extension was ten degrees. Plaintiff's motor loss was continuous in that he was impaired when rising from squatting position. Plaintiff's muscle weakness was continuous in that it was "4-4+/5." Plaintiff's sensory loss was impaired bilaterally at the S1, L1, L2, and L3 dermatomes. Plaintiff had no reflex loss (R. 281). Dr. Labatia opined Plaintiff experienced "significant lower back pain . . . which cause[d] significant decrease in ROM to his lumbar spine with aggravation of pain symptoms on any prolonged sitting, standing or walking; patient cannot tolerate any reasonable periods of sitting, standing or walking that will be needed for most job environments" (R. 282).

On April 1, 2004, Dr. Labatia completed a Medical Assessment of Ability to do Work-Related Activities (Physical) of Plaintiff. He opined Plaintiff's abilities to lift and carry were impaired by his L3 spine range of motions, impaired sensations, impaired motor strength in his lower

17

extremities, and aggravation of lower back pain and lower extremity pain with lifting. Dr. Labatia found Plaintiff could occasionally lift ten pounds but could not lift any weight frequently. Plaintiff could, according to Dr. Labatia, stand and/or walk for two hours, without interruption for fifteen minutes. Dr. Labatia supported his assessment with the medical findings that Plaintiff's MRI showed he had spinal stenosis, and he had impaired L5 spine range of motion and motor sensory of the lower extremities (R. 283). Dr. Labatia opined Plaintiff could sit for a total of two hours in an eight-hour workday, without interruption for fifteen minutes. He based this opinion on the same medical findings as above. Dr. Labatia found Plaintiff could occasionally balance, but could never climb, stoop, kneel, or crawl. Dr. Labatia found Plaintiff's ability to handle, see, hear, and speak were not affected by his impairment, but that his ability to reach, feel, and push/pull were significantly affected (R. 284). Dr. Labatia opined Plaintiff's impairment restricted his exposure to heights, moving machinery, temperature extremes, and humidity, but not chemicals, dust, noise, fumes, or vibration. Without stating how the activity was affected or the medical finding that supported such a limitation, Dr. Labatia opined Plaintiff's walking was affected by his impairment (R. 285).

On May 10, 2004, Plaintiff reported to Dr. Malone that Dr. Labatia had opined he was "definitely and indefinitely disabled." Plaintiff stated his pain was worsening and he was experiencing pain in his knees. Plaintiff stated Percocet relieved his pain for up to two hours. Plaintiff stated increase in activity, sitting or lying "for very long" increased his pain. Plaintiff requested an increased dosage of Percocet. Dr. Malone observed tenderness in Plaintiff's back. Plaintiff complained of pain in his patellae and peripatellar regions. He found no neurologic, gross motor, or sensory deficits. Dr. Malone diagnosed chronic lumbosacral back pain and bursitis in

Plaintiff's right knee. Dr. Malone opined Plaintiff had developed a tolerance to Percocet and increases his dosage to 10mg tablet, three times daily. Dr. Malone informed Plaintiff that he when he became tolerant to this dosage of Percocet, he would refer him to the pain clinic (R. 316).

On July 8, 2004, Plaintiff presented to Dr. Malone with "considerable lower back pain" and occasional upper back pain. Plaintiff reported that "several weeks ago his right knee popped open and [he] had some drainage from it." Plaintiff stated "Dr. Labatia injected the knee with some Cortisone when he saw him and he told [Plaintiff] that it was arthritis." Plaintiff stated his ankles hurt at times. Plaintiff stated he was "[s]till unable to do anything due to the pain in the back, knees and ankles." Upon examination, Dr. Malone noted Plaintiff was in no distress, his back was symmetrical, there was tenderness in his mid lower and distal lumbar region, his knees showed tenderness inferiorly and bilaterally, and he had no edema. Dr. Malone diagnosed chronic lumbosacral back pain with no significant change. Dr. Malone prescribed Percocet for Plaintiff's pain, Zanaflex for Plaintiff's muscle spasms, and Lexapro for Plaintiff's depression. Plaintiff informed Dr. Malone Lexparo "help[ed] him tremendously" (R. 314).

On September 2, 2004, Plaintiff presented to Dr. Malone with chronic back pain. He informed Dr. Malone he was "having a pretty good day" that day. Plaintiff stated he had "about one to two good days a month where he [was] not hurting quite as much." Plaintiff stated he experienced pain in his knees. Plaintiff reported he had no chest pain or shortness of breath. Plaintiff stated he was not having "any other related complaints, problems or symptoms or difficulties." Dr. Malone opined Plaintiff was in no distress, his neck was supple, his back was symmetrical, he had mild distal lumbar and lumbosacral tenderness to palpation, he had good range of motion, he had no edema and good pulses, and he had minimal tenderness in his left knee. Dr. Malone diagnosed chronic lower

19

spine back pain and prescribed Percocet. Plaintiff requested a prescription for four Percocet per day;
Dr. Malone denied the request (R. 312).

On November 1, 2004, Plaintiff informed Dr. Malone that his back was "about the same" and
that he had "bad days and good days." Plaintiff complained of "jaw" bone pain during the past two
to three months. He had no abdominal pain or cramping. Dr. Malone opined Plaintiff was
"otherwise doing well" as he had "no other new complaints or problems." Upon examination, Dr.
Malone observed Plaintiff was in no distress and had no gross motor or sensory deficits. Plaintiff's
back was symmetrical. Plaintiff had lumbar and lumbosacral tenderness, which was moderate in
intensity. Plaintiff's lower extremities "showed decreased range of motion due to pain in the lower
spine." Dr. Malone noted "mild . . . tenderness" at Plaintiff's tailbone. Dr. Malone diagnosed
chronic lumbar spine back pain, for which he prescribed Percocet and Zanaflex, and hypothyroidism,
for which he prescribed Synthroid (R. 309).

On January 6, 2005, Plaintiff reported to Dr. Malone that Percocet was not "providing him
with any significant back relief at all." Plaintiff informed Dr. Malone he experienced rectal drainage
and abdominal discomfort. Upon examination, Dr. Malone observed Plaintiff was in no distress.
Plaintiff's reflexes were "somewhat sluggish" in his upper and lower extremities. Plaintiff's neck
was nontender. Plaintiff's extremities were negative for edema. His back was symmetrical.
Plaintiff's distal lumbar was positive for tenderness upon palpation. Dr. Malone diagnosed chronic
lumbar spine back pain, for which he prescribed Vicodin; upper abdominal pain, which Dr. Malone
felt was gastroesophageal reflux disease and for which he prescribed Prevacid; hypothyroidism, for
which Dr. Malone encouraged Plaintiff to "stay on his Synthroid"; and pilonidal cyst, for which he
recommended Sitz baths as treatment and referral to a surgeon for removal. Plaintiff refused surgical

referral for the pilonidal cyst (R. 306).

On February 7, 2005, Plaintiff presented to Dr. Malone for follow-up treatment for hypothyroidism and chronic lumbosacral back pain. Plaintiff reported his back was "about the same, no worse and no better." He informed Dr. Malone he was "still unable to do much because of the pain down the legs and pain in the hips from the back." Plaintiff had no shortness of breath. He had no new complaints. Plaintiff stated Vicodin "did not help his pain at all" and he wanted "to go back to Percocet." Plaintiff reported he felt a "little bit better now that he [came] in more regularly for the TSH check and his Synthroid." Plaintiff appeared to be in no distress. His reflexes were "1-2/4 in the upper and lower extremities. His back was symmetrical. Dr. Malone noted tenderness in the lower lumbosacral spine. Dr. Malone prescribed Synthroid for Plaintiff's hypothyroidism. Dr. Malone prescribed Percocet for Plaintiff's back pain. He did not provide refills to the prescription and instructed Plaintiff to return on a monthly basis for refills. Plaintiff requested the Percocet prescription be for four pills per day; Dr. Malone refused this request and prescribed three per day. Plaintiff requested diet pills; Dr. Malone refused to prescribe those and discussed dietary lifestyle modifications with Plaintiff for losing weight. Plaintiff refused to seek the care of a surgeon for treatment of his pilonidal cyst (R. 301).

On March 1, 2005, Dr. Malone corresponded with Plaintiff's Social Security attorney. He wrote he had treated Plaintiff for the past six years. Dr. Malone opined Plaintiff's diagnoses were chronic back pain secondary to degenerative disc disease and spondylolisthesis; his symptoms were chronic and recurring lower back pain with occasional radiation to his legs and was exacerbated by minimal activity and movement; and Plaintiff had no numbness, paralysis, or physical weakness of the lower extremities. Dr. Malone informed Plaintiff's lawyer that the nature and severity of his

21

symptoms were credible, consistent with the objective medical findings, and could cause pain at the frequency and with the intensity consistent with Plaintiff's subjective symptoms. Dr. Malone wrote that any employment would have to be "tailor made" for Plaintiff "to meet his current medical condition"; he, therefore, opined "such employment [would] not exist in our society" (R. 317).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Slahta made the following findings:

1.  The claimant meets the nondisablity requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2.  The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant's lumbar disc disease and chronic obstructive pulmonary disease are considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(c).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  Based on all available evidence, the undersigned finds that the claimant retains the residual functional capacity to perform the exertional demands of sedentary work, or work which is generally performed while sitting and never requires lifting in excess of ten pounds. (20 C.F.R. §416.967). In addition, the claimant has the following non-exertional limitations: he must have a sit/stand option; he cannot work around hazards or climbing; he cannot work in areas of temperature extremes; he must work in a clean-air environment; and he can do no more than occasional postural movements.

7.  The claimant is unable to perform any of his past relevant work. (20 C.F.R. § 404.1565).

8.  The claimant is a "younger individual, age 18-44" within the meaning of the

regulations. (20 C.F.R. § 404.1563).

9.     The claimant has a high school education. (20 C.F.R. § 404.1564).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case. (20 C.F.R. § 404.1568).

11.     The claimant has the residual functional capacity to perform a significant range of sedentary work. (20 C.F.R. § 404.1567).

12.     Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical-Vocational Rule 201.27 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as: a surveillance systems monitor, of which about 1,900 jobs exist regionally, 97,000 nationally; a dispatcher, of which about 2,900 jobs exist regionally, 272,000 nationally; and an orders clerk, of which about 10,000 jobs exist regionally, 250,000 nationally.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision. (20 C.F.R. § 404.1520(g)).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be

somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were

the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws*

*v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the

reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual

finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The ALJ failed to properly evaluate the treating physicians' opinions pursuant to SSR 96-2p.

2. The ALJ failed to properly consider that the claimant's condition met Listing 1.04 and thus the decision is not supported by substantial evidence.

The Commissioner contends:

1. Substantial evidence supports the ALJ's evaluation of the medical evidence, including the medical opinions of record.

2. Substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or equal any of the listed impairments.

## C. Treating Physician Under 96-2p

Plaintiff contends the ALJ failed to properly evaluate the treating physicians' opinions

pursuant to SSR 96-2p. Specifically, Plaintiff alleges the "ALJ's decision is not supported by

substantial evidence because the treating physician's [sic] opinions were not given controlling

weight. Even if not deserving of controlling, the ALJ failed to properly weigh the treating source

opinions" (Plaintiff's brief at p. 9). Defendant contends substantial evidence supports the ALJ's

evaluation of the medical evidence of record.

SSR 96-2p mandates the following:

> Controlling weight. This is the term used in 20 CFR 404.1527(d)(2) and 416.927(d)(2) to describe the weight we give to a medical opinion from a treating source that must be adopted. The rule on controlling weight applies when all of the following are present:
>
> 1. The opinion must come from a "treating source," as defined in 20 CFR 404.1502 and 416.902. Although opinions from other acceptable medical sources may be entitled to great weight, and may even be entitled to more weight than a treating source's opinion in appropriate circumstances, opinions from sources other than treating sources can never be entitled to "controlling weight."
>
> 2. The opinion must be a "medical opinion." Under 20 CFR 404.1527(a) and 416.927(a), "medical opinions" are opinions about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight. (See SSR 96-5p, "Titles II and XVI: Medical Source Opinions on Issues Reserved to the Commissioner.")
>
> 3. The adjudicator must find that the treating source's medical opinion is "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques. The adjudicator cannot decide a case in reliance on a medical opinion without some reasonable support for the opinion.[3]
>
> 4. Even if well-supported by medically acceptable clinical and laboratory diagnostic techniques, the treating source's medical opinion also must be "not inconsistent" with the other "substantial evidence" in the individual's case record.
>
> If any of the above factors is not satisfied, a treating source's opinion cannot be entitled to controlling weight. It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by

---

[3]Plaintiff argues that the ALJ was "just wrong when he said [sic] that the claimant had an [sic] MRI on October 2, 2003. . ." because Plaintiff actually underwent a x-ray of his lumbar spine on that date (Plaintiff's brief at p. 9). The ALJ noted the following: "The claimant had an [sic] MRI on October 2, 2003, that showed very minimal wedging of L1 unchanged consistent with a very minor chronic compression fracture and L5 spondylolysis with high grade I spondylolisthesis, versus early grade II" (R. 18). The ALJ found that this piece of "objective medical evidence appeared to be little changed" from the other objective medical evidence of record. The undersigned finds that the ALJ committed harmless error when he referred to the October 2, 2003, radiologic exam as a "MRI" and not a x-ray. The ALJ was correct in the recitation of the results of that test; and, according to the record of evidence, no treating, consultative, or examining physician relied exclusively on that test in making a diagnosis or formulating an opinion as to Plaintiff's limitations.

medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.

In this case, the ALJ gave "less weight to the opinions of claimant's physicians, Drs. Malone and Labotis[sic]" (R. 22). As to Dr. Malone, the ALJ made the following finding:

> As noted above, Dr. Malone answered specific questions from the claimant's representative on March 1, 2005, but provided opinions that were both too broad and too narrowly constructed to be of great weight. Dr. Malone opined that the claimant's subjective complaints of symptoms were supported by the weight of medical evidence, and further opined that the claimant could not perform work that was not sufficiently tailor-made for his impairments, and that any such tailor-made employment did not exist in society. The opinions of Dr. Malone, as osteopathic specialist, regarding the claimant's credibility (i.e., that his subjective symptoms were consistent with evidence) are not controlling. Moreover, we have no showing of evidence regarding Dr. Malone's training or expertise in accurately gauging society's current workforce. By giving opinions that were too broad for his area of expertise, Dr. Malone has ventured into issues that are reserved to be determined solely by the Commissioner. (20 C.F.R. §404.1527). Yet, Dr. Malone also narrowly limited his opinions regarding the claimant's impairments and symptoms by not listing the specific limitations, or specifying what evidence of record supported those impairments or symptoms. As noted previously, Dr. Malone noted upon almost every examination of the claimant revealed that he was "pleasant" and/or "in no distress." Dr. Malone makes no mention of this evidence in his discussion of the claimant's limitations, which further undermines the evidentiary foundation of his opinions. Without specificity, such narrow opinions appear to lack any sustainable basis in evidence (R. 22). Despite earlier findings that the claimant had not changed, Dr. Malone wrote an open letter on November 12, 2003, that indicated that the claimant's condition had significantly deteriorated and that he was now in daily pain that increased with any increase in activity or from sitting . . . more than 30 to 45 minutes, and that both lower extremities were weak, and that he had grown depressed over his inability to work. . . . Yet, on examination, Dr. Malone noted that the claimant was in no distress, but had a flat affect. . . . Thus, although Dr. Malone had opined that the claimant [sic] condition had significantly deteriorated, he noted on his examination of the claimant that his back had been unchanged from prior examination (R. 19).

There is no dispute that Dr. Malone was Plaintiff's treating physician. He treated him regularly for many years. The opinion expressed by Dr. Malone relative to Plaintiff's disability is an issue reserved to the Commissioner because it is an administrative findings that is dispositive of

a case; *i.e.*, that would direct the determination or decision of disability. A statement by a medical source that a claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine that the claimant is disabled. Section 404.1527(3)(1) expressly provides that the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." Finally, "a statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. §4041527(e)(1). Such opinions of Dr. Malone cannot, therefore, be accorded controlling weight or even any special significance.

The medical opinions of Dr. Malone were evaluated by the ALJ, and his decision to assign "less weight" to his opinions is supported by substantial evidence of record. In *Craig v. Chater*, 76 F.3d 585, 590 (1996), the Fourth Circuit held:

> Circuit precedent does not require that a treating physician's testimony "be given controlling weight." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,
>
>> [i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.
>
> By negative implication, *if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.*

Here, the ALJ found the opinions of Dr. Malone were "too broad and too narrowly constructed to be of great weight" and inconsistent (R. 22). A review of the record supports the ALJ's findings regarding Dr. Malone's opinions.

As noted above, the ALJ thoroughly considered Dr. Malone's March 1, 2005, opinions,

contained in a letter to Plaintiff's lawyer. He was correct in finding Dr. Malone's opinions were "too narrowly constructed" relative to Plaintiff's impairments and symptoms "by [his] not listing the specific limitations, or specifying what evidence of record supported those impairments or symptoms." Dr. Malone wrote that Plaintiff's symptoms were credible and were consistent with his subjective complaints, but he did not support his diagnosis of chronic back pain with any clinical and/or laboratory diagnostic techniques. Dr. Malone did not list Plaintiff's limitation in his March 1, 2005, letter to Plaintiff's counsel; he only listed symptoms and the absence of symptoms (R. 22, 317). As noted below, Dr. Malone frequently noted Plaintiff appeared to be pleasant and in no distress. Additionally, Plaintiff, on several occasions, stated his symptoms were "no better, no worse." Dr. Malone did not address these factors in his opinion to Plaintiff's counsel.

The undersigned also notes the inconsistency Dr. Malone's opinions, leading the ALJ to assign "less weight" to those opinions. On November 12, 2003, Dr. Malone wrote an "open letter," opining therein that Plaintiff's Dr. Malone wrote Plaintiff's condition had 'significantly deteriorated" over the past several years and his "daily pain . . . seem[ed] to be increased significantly with any increase in activity or just from sitting for any significant amount of time (greater than thirty to forty-five minutes)" and that his extremities were extremely weak. Dr. Malone found Plaintiff disabled; however, Dr. Malone's findings and examinations before and after that date do not support that opinion (R. 19, 214).

- On January 7 and February 18, 2003, Dr. Malone found Plaintiff had "only slight weakness on left lower extremity" and no motor or sensory deficits (R. 18. 227, 486);

- On March 21, 2003, Dr. Malone examined Plaintiff and opined he was "neurologically unchanged"(R. 18, 223, 482);

- Dr. Malone examined Plaintiff on June 26, 2003, and opined that Plaintiff had good range of motion in his extremities, was pleasant, was in no distress, had no gross

neurological deficits, had back tenderness, and had decreased flexion and extension. The ALJ also noted Plaintiff reported to Dr. Malone that his muscles "felt tight" in his back and neck, but he had "no worsening of numbness, paralysis, or tingling in the extremities" (R. 18, 221);

- On August 29, 2003, Dr. Malone opined Plaintiff had "slight" weakness in his left lower extremity, positive "moderate" lumbar and distal lumbosacral tenderness to palpation, and positive straight leg raise bilaterally (R. 18, 219);

- On October 10, 2003, Plaintiff informed Dr. Malone that his pain "was about the same – no worse, no better." Dr. Malone opined that Plaintiff's neurological tests were unchanged, he had "no more than moderate" tenderness in his back, and he had decreased range of motion due to pain. Dr. Malone recommended no change in Plaintiff's treatment (R. 19, 217);

- On January 7, 2004, Dr. Malone found "overall," Plaintiff "seemed to be doing well." Plaintiff was in no distress, his extremities showed no edema, and he had good pulses (R. 19, 212);

- On May 10, 2004, Dr. Malone opined Plaintiff had no neurological, sensory, or gross motor deficits, but he did have tenderness in his back and apparent bursitis in his right knee (R.20, 316);

- Dr. Malone noted that Plaintiff was pleasant, in no distress, had a good range of motion in his lower extremities, and had "only mild tenderness upon palpation of his lumbosacral area" when he examined him on September 2, 2004 (R. 20, 312);

- On November 1, 2004, Dr. Malone noted Plaintiff was "doing well" as he had "no other new complaints or problems." Plaintiff was in no distress, had no gross motor or sensory deficits, had "moderate" lumbar and lumbosacral tenderness, had "decreased range of motion due to pain in the lower spine" and had "mild . . . tenderness" at his tailbone (R. 19, 309);

- Dr. Malone observed Plaintiff to be pleasant and in no distress on January 6, 2005, with his lower extremities negative for edema, his neck nontender, and with tenderness at his distal lumbar upon palpation (R. 20, 306);

- On February 7, 2005, Plaintiff informed Dr. Malone that his pain was "no better, no worse." Plaintiff requested his prescription be changed from Vicodin to four Percocet daily. Dr. Malone found Plaintiff was in no apparent distress, his reflexes were "1-2/4" in upper and lower extremities, and he had tenderness in the lumbosacral spine. Dr. Malone encouraged Plaintiff to lose weight and refused to prescribe more than three Percocet per day (R. 21).

The undersigned notes that Dr. Malone's significant findings during his treatment of Plaintiff were that Plaintiff's degree of limitations or symptoms were "mild," "slight" or "moderate." Dr. Malone did not include any of these details in his March 1, 2005, letter to Plaintiff's lawyer, as noted by the ALJ. Additionally, the above listed opinions of Dr. Malone are internally contradictory with his November 12, 2003, opinion that Plaintiff's condition had 'significantly deteriorated" over the past several years and his "daily pain . . . seem[ed] to be increased significantly with any increase in activity or just from sitting for any significant amount of time (greater than thirty to forty-five minutes)" and that his extremities were extremely weak." Inasmuch as Dr. Malone's opinions were "'inconsistent' with the other 'substantial evidence' in . . . [Plaintiff's] case record, his "opinion cannot be entitled to controlling weight." *See* SSR 96-2p. Substantial evidence supports the ALJ's findings, and he was justified in "accord[ing] significant less weight" to Dr. Malone's opinions. *Craig v. Chater, supra* at 590.

As to Dr. Labatia, he only evaluated Plaintiff on October 8, 2003, injected Plaintiff with a nerve root block on March 24, 2004, examined Plaintiff post nerve root block and completed a Back Questionnaire on March 30, 2004, and completed a Medical Assessment on Ability to do Work-Related Activities (Physical) on April 1, 2004; therefore, he does not qualify as a treating physician (R. 318-20, 277, 278-79, 280-82, 283-85). A definition of treating physician can be found in 20 C.F.R. § 404.1527(d)(2). At best, Dr. Labatia was an examining source as his one nerve root injection and two examinations of Plaintiff do not qualify him as Plaintiff's treating physician as they do not "provide a detailed longitudinal picture of [Plaintiff's] medical impairment(s)" and do not "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone . . . ." Dr. Labatia's treatment relationship with Plaintiff was not lengthy or

extensive and his examinations were not frequent. Most important, Dr. Labatia's opinions were not consistent. The ALJ assigned "less weight" to Dr. Labatia's opinions and found they were "defective" as they did "not appear to be consistent with his own medical findings and interpretations" (R. 22). The ALJ based his opinion on the following:

- Dr. Labatia's October 8, 2003, opinion that Plaintiff had no motor deficits in lower extremities, had intact sensation upon pinprick, pain that "appeared mechanical in nature with a discogenic element," most pain was from facet joints, had no evidence of radiculopathy, and should undergo conservative treatment for his condition (R. 18). In support of these diagnoses, Dr. Labatia reviewed Plaintiff's June 8, 2002, MRI of his cervical spine and opined it showed a "tiny central posterior disc protrusion a C5-6 without associated spinal stenosis and nerve root impingement," no neurologic impingement at C6-7, and was "unremarkable . . . [o]therwise," and Plaintiff's May 4, 2002, lumbar MRI and opined it showed a "slight degree of 2-millimeter anterolisthesis of L5-S1," no spinal stenosis, "bilateral neural foraminal narrowing at L5-S1 with a mild non-focal disc bulge at L4-5," and a "slight disc desiccation at L4-5 and L5-S1 with no significant loss of disc height" (R. 319);

- Dr. Labatia's March 30, 2004, opinion that Plaintiff had "significant lower back pain . . . which cause[d] significant decrease in ROM to his lumbar spine with aggravation of pain symptoms on any prolonged sitting, standing or walking; patient cannot tolerate any reasonable periods of sitting, standing or walking that will be needed for most job environments" (R. 282) and had stenosis and lumbar facet arthropathy, supported by the May 4, 2002, MRI and the June 9, [sic] 2002 x-ray (R. 20, 280-82); and

- The April 4 [sic], 2004, opinion that Plaintiff could lift/carry 10 pounds occasionally, stand/walk two hours in an eight-hour workday for no more than fifteen minutes, sit for two hours, occasionally balance, never climb, never stoop, never kneel, never crawl, and his ability to reach, feel, push, pull, work around heights, move machinery and temperature extremes were significantly affected by his impairments (R. 20).

As the record of evidence reveals, and as the ALJ correctly noted, Dr. Labatia relied on Plaintiff's May 4, 2002, lumbar MRI to find Plaintiff had no spinal stenosis on October 8, 2003, and the same MRI to find he had spinal stenosis on March 30, 2004. The ALJ also noted Dr. Labatia "specifically found that the [Plaintiff] did not have any radiculopathy" in October, 2003, but did in March, 2004 (R. 22, 279, 319). The ALJ noted Dr. Labatia offered no explanation for the "dramatic

change in" his "opinion over scant months, or why [he] relie[d] on information that sa[id] that the [Plaintiff] had no stenosis as support for a diagnosis of stenosis" (R. 22-23). The only encounter Dr. Labatia had with Plaintiff between October 8, 2003, and March 30, 2004, was on March 24, 2004, when he performed a nerve root injection of Plaintiff (R. 277). The record does not contain evidence that Dr. Labatia reviewed opinions of treating or other examining physicians to formulate his March 30, 2004, opinion. He did not rely on additional clinical or laboratory tests to formulate his March 30, 2004, opinion. Inasmuch as Dr. Labatia's March 30, 2004, opinion that Plaintiff had spinal stenosis is contradictory and not "well supported by medically acceptable clinical and laboratory diagnostic techniques," the ALJ's decision to assign less weight to his opinion is supported by substantial evidence. *Craig v. Chater, supra* at 590.

Plaintiff next argues that the state agency physicians completed physical residual functional assessments of Plaintiff before Plaintiff had a nerve root block on March 24, 2004, and after Dr. Labatia's March 30, 2004, opinion report (Plaintiff's brief at pp. 8 and 9). The ALJ did consider and rely on the opinions found in Dr. Lauderman's December 10, 2003, Physical Residual Functional Capacity Assessment and Dr. Franyutti's March 12, 2004, Physical Residual Functional Capacity Assessment of Plaintiff. He found that, to "the extent that [their opinions] show that the claimant's ability to perform exertional work or non-exertional work requirements are not grossly restricted, and to the extent that the opinions seem consistent with the majority of the objective findings in the medical evidence," he "agree[d]" with them (R. 22). This consideration of State agency physician opinion is consistent with 20 CFR §404.1527(i), which provides:

> Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists are highly qualified physicians and psychologists who are

also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether you are disabled.

On December 10, 2003, Dr. Lauderman, found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday; was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl; had no manipulative, visual, or communicative limitations; was unlimited in his exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation; and should avoid concentrated exposure to extreme cold and heat and hazards. Dr. Lauderman reduced Plaintiff's RFC to light (R. 203-06).

On March 12, 2004, Dr. Franyutti opined Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited; was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl; had no manipulative, visual, or communicative limitations; was unlimited in his exposure to wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation; and should avoid concentrated exposure to extreme cold and heat and hazards. Dr. Franyutti noted his disagreement with Dr. Malone's November 12, 2003, opinion that Plaintiff was "permanently and totally disabled" and found Plaintiff could perform light work (R. 269-74).

SSR 96-6p holds that:

> . . . [T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the

33

supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant or other program physician or psychologist. The adjudicator must also consider all other factors that could have a bearing on the weight to which an opinion is entitled, including any specialization of the State agency medical or psychological consultant.

The opinions of the state agency physicians are supported by evidence in the case record and are consistent with each other and the opinions of other medical opinions, specifically the opinions of Dr. Kerbyson, Dr. Labatia, and Dr. Douglas.

On December 3, 2003, Dr. Kerbyson noted Plaintiff had a normal gait; was comfortable in the sitting position, but uncomfortable in the supine position; ambulated with a limp, but was not unsteady, lurching, or unpredictable; had no tenderness in his legs; no redness, warmth, swelling, fluid, laxity, or crepitus in his knees, ankles or feet; no tenderness, redness, warmth, swelling, or Homans signs in his calves; had a normal cervical spine examination and a normal dorsolumbar spine examination; had normal straight leg raising test in the sitting position; had positive straight leg raising test in the supine position due to pain; could stand on one leg; had no joint tenderness, redness, warmth, swelling, or crepitus in his legs; had normal lumbosacral spine range of motion; and was able to walk on his heels and toes, perform tandem gait, and squat without difficulty. Plaintiff's muscle strength and tone, sensory modalities, reflexes, and motor modalities were all normal. Dr. Kerbyson's impression was for moderate obesity and chronic low back pain, and he opined Plaintiff's ability to perform work-related activities was "mildly impaired" (R. 19, 194-97).

Dr. Labatia, when he first examined Plaintiff in October, 2003, found Plaintiff was not in acute distress or pain. Dr. Labatia found Plaintiff had no swelling, redness, and normal lordosis of his lumbosacral spine region. Plaintiff had tenderness on deep palpation over the left paraspinal area

34

and "some" tenderness in his left SI joint. Plaintiff's range of motion was 70-80 degrees of flexion and 30 degrees extension and lateral bending. Plaintiff's straight leg raise test, Patrick's test, and Gaenslen's test were negative. Plaintiff's neurological examination revealed no motor deficits in his lower extremities. His knee and ankle jerks were "2+ bilateral." Plaintiff had intact pinprick sensation in his right lower extremity and diffusely impaired pinprick sensation in his left lower extremity (R. 319). Dr. Labatia relied on his examination and the results of a lumbar spine MRI and cervical spine MRI to make these determinations. Dr. Labatia recommended Plaintiff have L3-4, L4-5, and L5-S1 facet steroid injections and continue with his current pain medications and receive physical therapy for spinal stabilization techniques (R. 18, 320).

On February 23, 2004, Dr. Douglas reviewed Plaintiff's May 4, 2002, MRI of his lumbar spine and the April 7, 2000, x-ray of his lumbar spine. Dr. Douglas recommended Plaintiff treat his condition with "conservative management with facet injections as per Dr. Labatia's" recommendation (R. 20, 248).

Plaintiff did have nerve root injections in March, 2004. This was conservative treatment, as recommended by both Dr. Douglas and Dr. Labatia. Additionally, as noted above, the ALJ rejected the March 30, 2004, opinion report of Dr. Labatia because it was inconsistent with his own October 8, 2003, opinion and because Dr. Labatia used the same objective diagnostic information to formulate the inconsistent opinions. The ALJ considered the record as a whole and determined that he "agree[d]" with the opinions of the state agency physicians "to the extent that the opinions seem consistent with the majority of the objective findings in the medical evidence," specifically, the opinions of Drs. Kerbyson, Labatia (October 8, 2003, opinion), and Douglas.

The undersigned, therefore, finds the ALJ's evaluation of and findings as to Plaintiff's

treating physician, pursuant to SSR 96-2p, and his evaluation of and findings as to the opinions of Plaintiff's examining physician and the state agency physicians are supported by substantial evidence.

## D. Listing 1.04

Plaintiff argues the ALJ failed to properly consider that Plaintiff's spine condition met Listing 1.04 in that his "cursory statement is insufficient under Fourth Circuit law to provide a reviewing court with any means of determining whether or not the ALJ's determination is supported by substantial evidence" (Plaintiff's brief at pp. 10 and 12). Defendant contends that substantial evidence supports the ALJ's finding that Plaintiff's impairments did not meet or equal any of the Listed impairments.

20 C.F.R., Part 404, Subpt. P., App. 1, § 1.04A reads as follows:

1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); . . . .

The ALJ, in his decision, found the following: "The evidence supports a finding that the claimant has lumbar disc disease . . . , [an] impairment[] that [is] 'severe' within the meaning of the Regulations" (R. 16). "The claimant's physical impairment[] ha[s] been considered under Listings 1.04 . . . . The objective medical evidence does not show that the claimant has nerve root compression with limitation of motion of the spine, motor loss with sensory or reflex loss, evidence

of inflamed arachnoidal tissue resulting in the need for a change of position or posture every two hours, or evidence of stenosis that results in an inability to ambulate effectively" (R. 17).

In *Cook v. Heckler*, 783, F.2d 1168, 1172-73 (1986), the Fourth Circuit held that "[a]dministrative determinations are required to . . . facilitate judicial review." This is accomplished by an "ALJ . . . identif[ying] the relevant listed impairments" and "then compar[ing] each of the listed criteria to the evidence of [Plaintiff's] symptoms." Plaintiff argues and asserts that the ALJ's duty to conduct this in-depth analysis of the Listing criteria is triggered only if "there is ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments." *Ketcher v. Apfel*, 68 F.Supp, 2d 629, 645 (D.Md. 1999). (Plaintiff's brief at p. 11.) The "ample" evidence of record to which Plaintiff points in his brief is that he "struggle[d] with his back condition" and refers to Plaintiff's frequent visits to Dr. Malone; his "struggle to deal with his disability," causing him to be treated for depression; his being referred to Dr. Douglas; Dr. Douglas' referring him to Dr. Labatia; and Dr. Labatia's "clearly described . . . objective findings" (Plaintiff's brief at p. 12). The undersigned questions whether there is "ample evidence" in the record to "trigger[]" the Listing analysis by the ALJ; however, the ALJ did conduct the analysis in that he identified the listed impairment and, throughout his decision, compared the listed criteria to, not only the evidence found in Plaintiff's argument, but specific opinions of Drs. Malone, Douglas, Kerbyson, and Labatia; the opinions of the state agency physicians; and the results of diagnostic testing other medical evidence, which led him to conclude that Plaintiff did not meet all the specified criteria of Listing 1.04A. "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 110 S.Ct. 885 (1990).

The ALJ reviewed and evaluated the evidence of Dr. Malone, who examined Plaintiff frequently, and who found Plaintiff:

- had normal reflexes and sensory deficits on July 18, 2002 (R. 429);

- was in no distress, had no neurological deficits or changes, and had good lower extremity strength bilaterally on August 20, 2002 (R. 234);

- had no neurological deficits and his musculoskeletal exam was unchanged on October 1, 2002 (R. 231);

- had no gross motor or sensory deficits on January 7, 2003 (R. 18, 227, 486);

- had a "slight" weakness in his left leg on February 18, 2003 (R. 18, 484-85);

- had no reflex or sensory loss on February 25, 2003 (R. 496);

- had good range of motion in his extremities, was in no distress, had no gross neurological deficits on June 26, 2003 (R. 18, 221);

- had unchanged neurological exam results on October 10, 2003 (R. 19, 217);

- had no neurologic, gross motor, or sensory deficits on May 10, 2004 (R. 20, 316);

- was in no distress and his diagnosed condition of "chronic lumbosacral back pain" was significantly unchanged on July 8, 2004 (R. 314);

- was in no distress, his neck was supple, and had good range of motion on September 2, 2004 (R. 20, 312); and

- was in no distress, had no gross motor or sensory deficits, but had decreased range of motion due to complaints of pain on November 1, 2004 (R. 20, 309).

On October 8, 2003, Dr. Labatia found Plaintiff had no motor deficits in his lower extremities and no weakness or dermatomal sensory loss in his lower extremities (R. 18, 319). On December 3, 2003, Dr. Kerbyson opined Plaintiff's cervical and dorsolumbar spine examinations were normal. He also found Plaintiff's lumbosacral spine range of motion was normal and that Plaintiff could squat without difficulty. Plaintiff's muscle strength was normal; his sensory modalities were well

preserved; his reflexes were symmetrical and graded normally; and his motor modalities were well preserved (19, 196). He also noted Plaintiff had no swelling in his legs or spasm at his cervical or lumbar spine (R. 19). Dr. Kerbyson found Plaintiff's ability to perform work-related activities was "mildly impaired" (R. 19, 196-97). On February 23, 2004, Dr. Douglas opined Plaintiff should treat his condition conservatively with facet injections (R. 20, 248). The record of evidence reveals that none of these doctors opined that Plaintiff met Listing 1.04. Additionally, neither Dr. Lauderman nor Dr. Franyutti, the state agency physicians who completed PRFC's of Plaintiff, found Plaintiff had exertional limitations that precluded him from work activity. Both physicians found Plaintiff could perform light work (R. 22, 202-06, 269-74).

Plaintiff's diagnostic testing showed no evidence of nerve root compression. His May 4, 2002, MRI showed a slight degree of anterolisthesis of LT on S1; bilateral neural foraminal narrowing at L5-S1; mild nonfocal disc bulging; slight disc desiccation at L4-5 and L5-S1; no significant loss of disc height; no paraspinal masses; and no spinal stenosis (R. 18, 246, 463). On June 8, 2002, Plaintiff's lumbar spine x-ray was negative, except for bilateral pars defects at L5 (R. 18, 251, 425). A MRI of Plaintiff's cervical spine, also made on June 8, 2002, showed a "tiny posterior disc protrusion at C5-6 and C6-7 with no neurologic impingement" (R. 18, 250, 426). Plaintiff had a x-ray made of his lumbar spine on October 2, 2003, and it showed "very minimal wedging of L1 unchanged consistent with a very minor chronic compression fracture" and "L5 spondylolysis with high grade I versus early grade II spondylolisthesis, not changing with flexion or extension or from previous examination" (R. 18, 295). On December 1, 2003, Plaintiff had a x-ray made of his lumbar spine. It was normal (R. 19, 200).

As the objective medical evidence shows, Plaintiff did not experience motor loss with

sensory or reflex loss or nerve root compression with limitation of motion of the spine; therefore, Plaintiff's impairment did not manifest all of the specified medical criteria in Listing 1.04A as required by *Sullivan*, *id.* The undersigned finds the ALJ's analysis of Listing 1.04 criteria is sufficient based on the evidence of record and his finding is supported by substantial evidence.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this *22* day of *October*, 2007.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE